MINDEN BEEF CO., a Nebraska corporation, and Greater New York Association of Meat and Poultry Dealers, Inc., a New York corporation, Plaintiffs,

v.

The COST OF LIVING COUNCIL, Defendant.

No. CV73–L–229.

United States District Court, D. Nebraska.

Aug. 13, 1973.

Robert B. Crosby and James L. Sedgwick, Lincoln, Neb., for plaintiffs.

Paul Michael, Dept. of Justice, for defendant.

## MEMORANDUM OF DECISION ON REQUEST FOR PRELIMINARY INJUNCTION AND ON MOTION TO DISMISS

URBOM, Chief Judge.

Effective July 18, 1973, the Cost of Living Council altered ceilings on pork, lamb, and poultry prices to permit certain increases in prices of those meats, but declared that ceilings on beef and veal would remain unaltered until September 12, 1973. It is the continuation of the unaltered ceilings on beef and veal that is challenged in this suit as being unlawful. The plaintiffs have asked for a preliminary injunction and the defendant has moved for a dismissal.

## JURISDICTION

By authority of Section 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904, the district courts of the United States have exclusive jurisdiction of cases or controversies emanating from the Act or regulations or orders issued under it. However, any substantial constitutional issue must be certified to the Temporary Emergency Court of Appeals.

## SUMMARY OF ISSUES

█ Each of the issues projected by the complaint is phrased in terms of the denial of due process of law or of equal protection of the law or the taking of property without just compensation, contrary to the Constitution of the United States. It is not at all clear, however, that the plaintiffs intended to limit their claims solely to their constitutional ramifications, so each issue admitting of broader treatment will be afforded it. For the reasons hereinafter stated, I conclude that none of the issues is a substantial constitutional issue, so I shall not certify any to the Temporary Emergency Court of Appeals, and that there is no substantial likelihood of success by the plaintiffs if a full trial on the merits is hereafter held, so I shall not issue a preliminary injunction against the Cost of Living Council. Neither shall I dismiss the action, however, because the pleadings state a claim upon which relief could be granted, if the evidence were sufficient to support it. If the plaintiffs choose to have a trial on the merits, they deserve an opportunity to produce their full supply of supportive evidence.

The plaintiffs assert that:

1. The regulations of the defendant in treating the sales of beef and veal differently from sales of other meats are arbitrary and capricious;

2. The regulations of the defendant do not meet the requirements of § 203(b)(1), (2) and (5) of the Economic Stabilization Act of 1970;

3. The regulations were issued without formal hearings required by the Act;

4. The regulations result in losses to the plaintiffs' business, thereby constituting a taking by the government without just compensation; and

5. The Economic Stabilization Act of 1970 is an unlawful delegation of legislative authority.

## ARBITRARINESS AND CAPRICIOUSNESS

█ This court has no authority merely to substitute its economic opinion for that of the Cost of Living Council and the President of the United States. The wisdom of regulations adopted for the reduction of inflation is not for the judicial branch of government to judge. To employ hindsight to declare those regulations invalid because they may appear at this moment unwise or ineffective would be an arrogation. This is true in evaluating laws and regulations adopted by states, Nebbia v. New York, 291 U.S. 502, 537, 54 S.Ct. 505, 78 L.Ed. 940 (1933); Unemployment Commission v. Aragon, 329 U.S. 143, 153–154, 67 S. Ct. 245, 91 L.Ed. 136 (1946); Railway Express v. New York, 336 U.S. 106, 109–110, 69 S.Ct. 463, 93 L.Ed. 533 (1948); McGowan v. Maryland, 366 U. S. 420, 425, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1960); Ferguson v. Skrupa, 372 U.S. 726, 729–730, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1962); Dandridge v. Williams, 397 U.S. 471, 484–487, 90 S.Ct. 1153, 25 L. Ed.2d 491 (1969), as well as determining the constitutionality of regulatory schemes fashioned by federal agencies, Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964); Richardson v. Belcher, 404 U.S. 78, 84, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971), and United States v. Lieb, 462 F.2d 1161 (T.E.C.A.1972). Rather, this court is limited to an evaluation of whether a rational basis existed for promulgating the regulations now being challenged.

This memorandum, therefore, offers neither criticism nor defense of the reg-

ulations in question, except to the bare extent of determining whether they had a rational basis in fact and economic theory, as conditions appeared on July 18, 1973.

At this point a summary review of the events leading up to the regulations of July 18, 1973, is in order. During Phase II, November 14, 1971, through January 11, 1973, the red meat component of the Consumer Price Index increased 11.8 per cent, almost twice the rate of all food prices. In the months of January and February of this year the red meat component increased by a rate in excess of 10 per cent, while all items in the Consumer Price Index increased approximately 1 per cent. On March 29, 1973, in response to the increase in the price of red meat, President Nixon ordered meat price ceilings in order to restrain the rapid price increases. The Cost of Living Council implemented meat price ceiling regulations applicable to all purchases and sales of meat, after slaughter, by or from a manufacturer, wholesaler, or retailer. Although not anticipated prior to the imposition of ceiling prices, grain prices rose rapidly from March 30 through May 30, such that the price of corn increased 50 per cent and the price of soybeans increased nearly 100 per cent. By June of 1973 there were indications that the pork industry was not expanding as expected. Moreover, by June it was clear that inflation was not being controlled by the voluntary price controls of the Phase III program, and in fact the rate of inflation had risen to an annual rate of 8.7 per cent from January to April of 1973, in contrast to the rate of 3 per cent during 1972. In response to this increase in inflation, the President issued Executive Order 11723 on June 13, 1973, in which he announced a freeze on prices for a maximum period of 60 days. This order did not affect the meat price ceilings imposed earlier, and those ceilings remained in full force. Two reasons were given for imposing a freeze on June 13. The first was to check the rapid increase of inflation,

and the second was to provide for a cooling-off period of the economy, during which time a Phase IV program could be developed.

It was during this Phase IV planning period that the defendant developed regulations relating to the ceiling prices on meat products. The evidence indicates that the goals of the Phase IV program were to manage the inflationary "bulge" by allowing different segments of the economy to come off the freeze at different times to prevent a sudden increase in consumer prices once the freeze was lifted, and to foster an increase in production which would eventually lead to a decrease in consumer prices for specific commodities.

The Phase IV regulations formulated by the defendant relating to meat price ceilings provided that the ceiling prices on all agricultural products would be lifted to the extent of allowing for the pass-through of raw agricultural product cost increases incurred since June 8, 1973. The regulations relating to beef and veal, however, provided for the continuation of the beef price ceiling until September 12, 1973.

■ The issue is whether there was a rational basis for discriminating against the beef and veal industry in the Phase IV regulations. I am convinced that the answer must be in the affirmative.

From the affidavit of Dr. John T. Dunlop, the Director of the Cost of Living Council, the following facts and considerations were before the defendant when determining the Phase IV regulations, relating to meat price ceilings:

". . . One of the primary goals sought to be achieved by Phase IV was to manage the inflationary bulge by allowing different segments of the economy to come off the freeze in different stages. The staged approach serves to delay pass through of some cost increases which had been built up prior to and during the freeze and to reduce the sudden surge of consumer prices in any one period of time.

". . . During the Phase IV planning period, meat prices were pressed tightly against existing ceiling prices, requiring some continued controls in order to avoid a severe price bulge. Estimates compiled by the CLC staff indicated that the removal of ceiling prices on beef and pork and of the freeze on poultry would result in immediate percentage price increases of approximately 1% of the CPI for each of those commodities. Bureau of Labor Statistics studies indicate that the consumer spends approximately 65% more money on beef than on pork and four times as much on beef as on poultry. . . . Therefore, the expected price increases in beef products would have a far more substantial impact on the consumer's standard of living.

". . . It was also recognized during this time that certain sectors of the economy contained pent-up pressures for price increases which had to be released immediately to avoid undue disruptions of future production. Specifically, disruptions of poultry and pork production were becoming serious and it was decided that some immediate relief was necessary in these areas. Rather than expanding production over the 1972 levels, which were 5% below 1971 levels, farmers were merely planning to farrow the same number of sows during June through November of 1973 as during the corresponding period of 1972. . . . Placement of eggs into incubators for the production of broilers was declining both in absolute numbers and as a percentage of 1972 placements. . . .

". . . The nature of the beef industry, on the other hand, is such that no imemdiate [sic] crisis was evident, despite the ceiling prices in effect since Marcy [sic] 29. . . .

". . . The most important stimulus to the increased production of beef is the price of feeder cattle (i. e. the cattle being sold to the feed lot operators). This price was nearly 50%

higher in July 1973 than a year ago, and therefore high enough to encourage expansion of cow-calf operations. Consequently, producers were not expected to liquidate cattle breeding herds."

The evidence also suggests that other factors were considered by the defendant in determining to maintain the price ceiling on beef and veal such as the potential problems of black marketing, reimportation of beef processed through Canada, withholding of cattle by producers, and the closing of processing plants, and unemployment in the beef and veal industry. The evidence clearly establishes that the defendant did not decide to maintain the beef and veal price ceiling arbitrarily or capriciously. Maintaining the ceiling on beef and veal rationally fit the goals of spreading the expected price increases, and relaxing the ceilings on poultry and pork rationally pointed toward increasing production in those areas of the economy.

It reasonably could be concluded, as of July 18, 1973, that the poultry and pork industries were in a less favorable position than the beef and veal industries. Controlling more tightly the latter industries than the former, therefore, represented no invidious discrimination.

The plaintiffs argue that it was not reasonable for the defendant to maintain the price ceiling on beef and veal, since an average consumer spends only 2.4 per cent of his income on beef or beef products and inflation could certainly not be controlled by dealing with only 2.4 per cent of a consumer's income. While it is undoubtedly true that such maintenance of beef and veal ceilings, considered alone, could not have a major impact on inflation, it must be remembered that this is by no means the only control on the economy. Controls of varying kinds are on many segments of the economy and the total may or may not reach the ultimate goal of controlling inflation, depending upon the reactions, both financial and psychological, of producers and consumers. The expert witness of the plaintiffs, Dr. Everett Peterson, testi-

fied to a rational and plausible reason for not maintaining the beef and veal price ceiling, and indicated that maintaining that ceiling added nothing in the struggle against inflation. On the other hand, the expert witness for the defendant gave a rational and plausible explanation for the continuation of the beef and veal price ceiling.

Under those circumstances, I cannot say that the temporary continuation of the ceiling on beef and veal was not rationally based, either in fact or economic theory, or that treating the beef and veal segment differently from others was an invidious discrimination.

### REQUIREMENTS OF § 203(b) (1), (2) and (5)

Sections 203(b)(1), (2) and (5) of the Economic Stabilization Act of 1970 state:

"(b) In carrying out the authority vested in him by subsection (a), the President shall issue standards to serve as a guide for determining levels of wages, salaries, prices, rents, interest rates . . . and similar transfers which are consistent with the purposes of this title and orderly economic growth. Such standards shall—

(1) be generally fair and equitable;

(2) provide for the making of such general exceptions and variations as are necessary to foster orderly economic growth and to prevent gross inequities, hardships, serious market disruptions, domestic shortages of raw materials, localized shortages of labor, and windfall profits;

\* \* \* \* \* \*

(5) call for generally comparable sacrifices by business and labor as well as other segments of the economy."

 While the evidence of the plaintiffs shows that there are disruptions in the beef and veal industry, and shortages exist in the supply of beef and veal, I cannot conclude that the defendant has violated its statutory mandate of attempting to treat segments of the economy equitably and requiring equal sacrifices from sectors of the economy. Subsection (a) of § 203 authorizes the President to issue orders and regulations to stabilize prices, among other things. The President delegated his authority under the Act to the defendant and charged the defendant with promulgating regulations under Phase IV. As has been noted previously, the defendant chose to single out the beef and veal industry by not removing price ceilings on July 18, while easing ceiling prices on other meat commodities. The evidence shows, however, that this difference in treatment was rationally based and was not invidiously discriminatory against the beef and veal industry. Moreover, the use of the word "generally" in subsections (1), (2) and (5) indicates that completely equitable treatment of different segments of the economy was not required or contemplated by the Act. Obviously, treating all segments of the economy precisely the same during each short-term phase need not be done, and an effort to equalize the health of various segments, which is an acceptable goal in the battle against inflation, involves different treatment occasionally of different parts of the economy.

The regulations here under attack do not violate the requirements of the Act.

### FORMAL HEARINGS

The next claim of the plaintiffs is that since the Cost of Living Council did not hold hearings on the regulations issued July 19, 1973, its action is in contravention of the statutory scheme detailed in Section 207 of the Economic Stabilization Act of 1970, as amended.

Section 207(a) makes inapplicable to Cost of Living Council determinations most provisions of the Administrative Procedure Act. Of interest here is the fact that it does make applicable 5 U.S. C. § 553. Title 5, U.S.C. § 553(b) requires that general notice of rule making shall be published in the Federal Register and details the contents of that notice. Title 5, U.S.C. § 553(c) goes on

to require that interested parties be given an opportunity to participate in the rule making. Title 5, U.S.C. § 553(d) requires that publication of a substantive rule shall be made not less than 30 days before its effective date unless certain exceptions obtain. The relevant exception here is that such 30-day period is not necessary if the agency so finds for good cause and says so in publishing the rule.

The plaintiffs in this case do not allege that the notice requirements of 5 U.S.C. § 553(b) were violated by the Cost of Living Council. Their claim is rather that once it became apparent exactly what the Cost of Living Council had determined to do, the regulations issued should not become effective until after the beef industry had had the opportunity for formal hearings on the matter. Hence, no further consideration need be given to this section.

The evidence before this court, particularly the affidavit of Dr. Dunlop, indicates that the requirements of 5 U.S.C. § 553(c) have been met. The affidavit shows that there were several opportunities extended by the Cost of Living Council for participation in rule making regarding the Phase IV food regulations.

The requirements of 5 U.S.C. § 553(d) were also met in that the Cost of Living Council included in the publication of its regulations reasons for making the regulations effective in less than 30 days from the date of publication.

> "Because the purpose of these regulations is to provide immediate guidance as to Executive Order ———— and to Cost of Living Council decisions, I find that publication in accordance with normal rule making procedure is impracticable and that good cause exists for making these regulations effective in less than 30 days."
>
> (published statement of James W. McLane, Deputy Director, Cost of Living Council, and Director, Special Freeze Group, issued July 18, 1973)

The only question for this court is whether the reasons detailed show a rational basis for the decision to make the regulations effective immediately. It follows from the above holding that the Cost of Living Council had a rational basis for the substantive actions it took on July 18, 1973, that the procedure of immediate implementation of regulations also had a rational basis. The evidence shows a rational basis for immediate action on the pork and poultry problem and for the policy of spreading out the price increases inevitable when controls were relaxed. It may well be that other courses of action were open to the Cost of Living Council which would have been better policy, but this court cannot say that immediate implementation of the regulations is without a rational basis. Thus, the relevant requirements of § 207(a) of the Economic Stabilization Act of 1970 have all been fulfilled.

The requirements of § 207(b) of the Act are not at issue in this case, because they deal with the establishment of procedures for seeking interpretation, modification, or rescission of regulations or seeking an exception or exemption from such regulations. These procedures are not challenged by the plaintiffs.

The crucial section of the Act for purposes of this case is § 207(c). It is this section which arguably contains language requiring the hearings the plaintiffs contend were not given to them by the Cost of Living Council. This section states:

> "To the maximum extent possible, the President or his delegate shall conduct formal hearings for the purpose of hearing arguments or acquiring information bearing on a change or a proposed change in wages, salaries, prices, rents, interest rates, or corporate dividends or similar transfers, which have or may have a significantly large impact upon the national economy, and such hearings shall be open to the public except . . . ."

This subsection presents two immediate interpretative difficulties: First,

are hearings mandatory? and second, if hearings are mandatory, what sort of hearings must they be? The word "shall" appearing in a statute as a general rule implies that whatever "shall" be done is mandatory. Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566 (1935); Peoples Securities Co. v. Securities and Exchange Commission, 289 F.2d 268, 274 (C.A. 5th Cir. 1961). The difficulty here is that the phrase "to the maximum extent possible" appears to modify "shall."

■ Since the term "to the maximum extent possible" is ambiguous, resort may be had to legislative history in interpreting the statute. Highland Supply Corp. v. Reynolds Metals Co., 327 F.2d 725 (C.A. 8th Cir. 1964); cf. District of Columbia National Bank v. District of Columbia, 121 U.S.App.D.C. 196, 348 F.2d 808 (1965). The term could be read either as an invitation to offer excuses for not holding hearings or as an emphasizer of the mandatory character of the hearings.

■ The legislative history indicates that hearings are mandatory in certain circumstances.

> "The Senate bill required the President to conduct formal hearings with respect to a change or proposed change in wages, salaries, prices, rents, interest rates or corporate dividends. The House bill contained no such provision. The House agreed to accept the Senate provision with an amendment which would require hearings only on matters that are of such importance as to have a significant effect on the economy."

> (Conference Report No. 92–753, 1971 U.S.Code Congressional and Administrative. News pp. 2307, 2309)

■ The second question is more difficult. The statute says that the required hearings are to be formal ones. Furthermore, it says only that the hearings are to concern themselves with hearing arguments and acquiring information on a change or proposed change in prices. It does not require that the hearings be on regulations which are proposed but not yet effective. This latter point clearly follows from the fact that § 207(a) of the Economic Stabilization Act specifically excludes the procedures used by the Cost of Living Council from the requirements of 5 U.S.C. §§ 556, 557. These are the sections of the Administrative Procedure Act which detail the procedures to be used in hearings on proposed regulations. Moreover, 5 U.S.C. § 553, which is made applicable by § 207(a), states quite clearly that:

> "When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection."

The obvious deduction from this language together with the exclusion of Cost of Living Council actions from the requirements of 5 U.S.C. §§ 556–557 is that Congress is not in § 207(c) requiring hearings on proposed regulations prior to their effective date. Requiring formal hearings is not identical with requiring that rules be made on the record after opportunity for an agency hearing. United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L. Ed.2d 453 (1972). It should also be noted that there is other federal district court authority for a holding that regulations adopted by the Cost of Living Council need not have an administrative hearing before the regulations become effective. United States v. Great Atlantic and Pacific Tea Company, 342 F. Supp. 272 (U.S.D.C.Md.1972). This case was decided under the Economic Stabilization Act of 1970 on an action of the Pay Board prior to the effective date of the 1971 amendments. The statutory language applicable to the Pay Board at the time of the action in question contained no provisions in any way similar to §§ 207(a) or 207(c). Thus this case was not on its facts an interpretation of § 207(c). Rather its holding was that in the absence of any relevant administrative statute, the Administrative Procedure Act did not require

the holding of formal hearings prior to the effective date of regulations if the government agency certifies that it is impracticable to issue such regulations with notice and public procedure thereon. The court does, however, cite § 207 as supporting its holding, although it does not detail any reasons for so stating. The reasoning developed above is sufficient to show that hearings on proposed regulations prior to their effective date are not required by § 207(c).

█ Section 207(c) does, however, require hearings of a formal nature, open to the public, to hear arguments and acquire information on changes in government policy regarding prices if such policy change will have a significantly large impact upon the national economy. The evidence before this court indicates that the policy determination made on July 18, 1973, would have a significant impact upon the national economy. Thus formal hearings were required in this case.

█ The evidence indicates that such hearings were held prior to the July 18, 1973, policy change. The affidavit of Dr. Dunlop indicates that an open public meeting was held on July 2, 1973, by the Cost of Living Council Food Advisory Committee to discuss proposals for the regulation of the food industry during Phase IV. The affidavit further indicates that all segments of the food industry, including the beef and veal industry, were given an opportunity to participate in the meeting and to express their views. His affidavit also indicates several other meetings between beef and veal industry officials and Cost of Living Council members. These alone would probably not fulfill the requirement to hold formal hearings open to the public. Absent any evidence by the plaintiffs on the character of the July 2, 1973, open public meeting, this court holds that this meeting fulfilled the statutory requirement of § 207(c).

Therefore, it is the holding of this court that there is no evidence that the procedural requirements of the Economic Stabilization Act of 1970, as amended, have been violated.

## "TAKING" WITHOUT COMPENSATION

█ The evidence before me shows that processors and sellers of beef are losing money as a result of the price ceiling, some to the extent of closing businesses. The plaintiffs are losing money and are in danger of being unable economically to continue long to operate. That does not mean, however, that the government has "taken" their property and must pay just compensation for the "taking" by the command of the Fifth Amendment. As the Supreme Court stated in Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1943), in discussing the applicability of the Fifth Amendment to certain rent orders promulgated under the Emergency Price Control Act of 1942 (50 U.S.C. App. (Supp. II) § 901):

". . . We are not dealing here with a situation which involves a 'taking' of property. . . . Of course, price control, the same as other forms of regulation, may reduce the value of the property regulated. But, as we have pointed out in the Hope Natural Gas Co. case (320 U.S. [591], p. 601, 64 S.Ct. 281 [88 L.Ed. 333]), that does not mean that the regulation is unconstitutional. Mr. Justice Holmes, speaking for the Court, stated in Block v. Hirsh, *supra*, 256 U.S. page 155, 41 S.Ct. page 459, 65 L.Ed. 865: 'The fact that tangible property is also visible tends to give a rigidity to our conception of our rights in it that we do not attach to others less concretely clothed. But the notion that the former are exempt from the legislative modification required from time to time in civilized life is contradicted not only by the doctrine of eminent domain, under which what is taken is paid for, but by that of the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay.' A member of the class

which is regulated may suffer economic losses not shared by others. His property may lose utility and depreciate in value as a consequence of regulation. But that has never been a barrier to the exercise of the police power. L'Hote v. New Orleans, 177 U.S. 587, 598, 20 S.Ct. 788, 792, 44 L.Ed. 899; Welch v. Swasey, 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923; . . . West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703. . . ."

321 U.S. 517, 518, 64 S.Ct. at 648, 649.

Every prohibitory regulation diminishes rights to some extent, but a diminution of rights is not the equivalent of a taking under the Fifth Amendment. See, American Power and Light Co. v. Securities and Exchange Commission, 141 F. 2d 606 (C.A. 1st Cir. 1944), aff'd 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946).

The argument to the contrary is not substantial enough to warrant certification to the Temporary Emergency Court of Appeals in view of the *Bowles* decision.

## DELEGATION OF LEGISLATIVE AUTHORITY

The discussion in Amalgamated Meat Cutters & Butcher Workmen v. Connally, 337 F.Supp. 737 (U.S.D.C.D.C.1971), of the issue of whether the Economic Stabilization Act of 1970 is an unconstitutional delegation of legislative authority is analytically solid. There is no merit to the plaintiffs' argument on the issue.

## CONCLUSION

It is for the foregoing reasons that I entered an order on August 11, 1973, denying the request for a preliminary injunction against the retention of the ceilings on beef and veal prices. Because swiftness of final decision is highly to be desired, I have set the groundwork for an immediate appeal to the Temporary Emergency Court of Appeals, if that court chooses to accept an appeal from the interlocutory order and if the plaintiffs would rather have an immediate appeal than have a full trial on the merits in this court.