Howard M. METZENBAUM et al., Plaintiffs,

v.

James B. EDWARDS et al., Defendants.

Civ. A. No. 81–0405.

United States District Court, District of Columbia.

March 4, 1981.

Herman Schwartz, Margery F. Baker, Washington, D. C., Thomas I. Atkins, Curtis E. Rodgers, New York City, J. Francis Pohlhaus, Washington, D. C., for plaintiffs.

C. Max Vassanelli, Michael T. Scott, Vicki L. Hawkins, Kirk I. Victor, U.S. Dept. of Justice, Washington, D. C., for defendants; Thomas P. Humphrey, Larry P. Ellsworth, Robert C. Power, Judith A. Mather, U.S. Dept. of Energy, Washington, D. C., of counsel.

R. Bruce McLean, Daniel Joseph, David A. Holzworth, Stark Ritchie, Stephen Williams, Washington, D. C., for amicus curiae American Petroleum Institute.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

On January 28, 1981, President Reagan issued Executive Order No. 12287, lifting all remaining price and allocation controls on crude oil, gasoline, and propane, effective immediately. He cited as statutory authority for his action the Emergency Petroleum Allocation Act of 1973, as amended, 15 U.S.C. § 751 et seq. (EPAA), and he stated that the action was being taken in order to provide for "an immediate and orderly decontrol of crude oil and refined petroleum products." E.O. 12287, 46 Fed.Reg. 9909 (January 30, 1981).[1] On February 19, 1981, the plaintiffs[2] filed a complaint alleging that the Executive Order is invalid because it was not preceded by formal notice, hearing, and other procedures mandated by the Administrative Procedure Act, the EPAA, and the Department of Energy Organization Act, 42 U.S.C. § 7101 et seq. At the same time, plaintiffs filed a motion for a preliminary injunction seeking to halt enforcement of the Executive Order pending final determination of this action. A hearing on this motion was held on February 26, 1981. After consideration of the matters raised at the hearing and the memoranda filed by the parties in light of the standards set forth in Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 559 F.2d 841 (D.C. Cir. 1977), the Court has concluded that the motion for preliminary injunction must be denied.

■ 1. The government claims that the decision to decontrol was entirely within the unfettered discretion of the President and that his decision to proceed without advance notice or public hearing is for that reason not judicially reviewable. That claim is based on 15 U.S.C. § 760g, which states that, as of June 1, 1979,

[n]otwithstanding any other provision of this chapter ... the President's authority to promulgate, make effective, and amend a regulation pursuant to section 753(a) of this title shall become discretionary.... [3]

1. Certain selected controls were allowed to remain in effect until March 31, 1981, and the record-keeping requirements of the EPAA were to remain in effect until modified by the Secretary of Energy.

2. The plaintiffs are U.S. Senators Metzenbaum, Biden, Kennedy, Matsunaga, Williams, Pell and Riegle, U.S. Representatives Moffett and Seiberling, the States of Minnesota and New York, the Attorney General of Rhode Island, the AFL–CIO and four international unions, the National Association for the Advancement of Colored People, and six consumer or energy groups.

3. Section 753(a) requires the President to promulgate a regulation providing for mandatory allocation and price controls of crude oil, residual fuel oil, and refined petroleum products.

The Court finds the government's argument to be unpersuasive. Although the statute leaves the *substantive* decision as to whether or not to promulgate petroleum control regulations to the President's discretion, it does not in any way relieve him of the obligation to comply with required *procedures*[4] as he exercises that discretion. None of the decisions cited by the government holds or intimates that, merely because a government official has discretion with respect to substance, he is relieved of the obligation to comply with the procedures mandated by law. It is clear that the President is bound by the procedures prescribed by the various laws which govern this case and that the issue of his compliance or noncompliance with such procedural laws is subject to judicial review. See, *e. g., Natural Resources Defense Council, Inc. v. Securities and Exchange Commission,* 606 F.2d 1031, 1044–45 (D.C.Cir.1979).

2. Plaintiffs assert that the President was required to comply with the notice and comment provisions of the Administrative Procedure Act, 5 U.S.C. § 553,[5] and with the advance publication provision of section 501 of the DOEOA, 42 U.S.C. § 7191. The APA, by its terms, applies to rules issued by government agencies, and section 501 of the DOEOA to regulations and orders issued by the Secretary of the Energy.

In the view of this Court, it is extremely unlikely that either provision was intended to apply to Executive Orders issued by the President.[6] Literally thousands of Executive Orders have been issued without prior notice and comment since the enactment of the APA,[7] and the courts have never overturned any of them for want of compliance with APA procedures. In the absence of the weightiest of reasons,[8] the Court would not be justified in reversing this consistent course of conduct—certainly not in the context of a motion for preliminary injunction when there has been no briefing or consideration of the merits. This is so particularly because it is difficult to visualize how the President could adequately perform his duties if he were required to hold APA-type hearings in connection with his myriad duties.[9] Similarly, section 501 of the DOEOA—which in terms applies only to the Secretary of Energy—has never been regarded as reaching to Executive Orders, and plaintiffs have provided the Court with no reason why this provision should be so extended.

3. Plaintiffs' contention that section 207(c) of the Economic Stabilization Act required the President to hold formal, public hearings before issuing the Executive Order in question is deserving of more serious consideration. Section 207(c) provides that

> To the maximum extent possible, the President or his delegate shall conduct formal hearings for the purpose of hear-

---

**4.** 15 U.S.C. § 754 requires the application of the procedures contained in sections 205 through 207 of the Economic Stabilization Act of 1970 to "the regulation promulgated under section 753(a) of this title, to any order under this chapter, and to any action taken by the President (or his delegate) under this chapter ...."

**5.** These provisions are made generally applicable here through section 207(a) of the Economic Stabilization Act.

**6.** See *Kissinger v. Reporters Committee for Freedom of the Press,* 445 U.S. 136, 156, 100 S.Ct. 960, 972, 63 L.Ed.2d 267 (1980) (Office of the President is not an "agency" for purposes of the Freedom of Information Act).

**7.** President Carter issued several Executive Orders decontrolling petroleum products (*e. g.,* E.O. 12153, 44 Fed.Reg. 48949 (Aug. 21, 1979);

E.O. 12186, 44 Fed.Reg. 76477 (Dec. 27, 1979)) without giving advance notice or holding hearings of any kind.

**8.** Plaintiffs have neither adduced evidence of congressional intent nor have they cited compelling public policy reasons in support of the conclusion they advocate on this issue.

**9.** It is to be noted, too, that the APA allows waiver of notice and comment procedures when for "good cause" it is determined that such procedures are impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. § 553(b)(B), (d)(3). Some of the considerations relevant to the Economic Stabilization Act discussion *infra* also apply to the "good cause" standard of the APA.

ing arguments or acquiring information bearing on a change or a proposed change in . . . prices . . . which have or may have a significantly large impact upon the national economy.

This provision relates to the decontrol of petroleum products, and it requires formal hearings with respect thereto by the President or his delegate "to the maximum extent possible." Obviously, the quoted phrase is the crux of the matter.

The case law interpreting this phrase is so sparse as to be practically non-existent. In *Minden Beef Co. v. Cost of Living Council*, 362 F.Supp. 298 (D.Neb.1973), the court found the term to be "ambiguous," and capable of being read "either as an invitation to offer excuses for not holding hearings or as an emphasizer of the mandatory character of the hearings." 362 F.Supp. at 306.[10] The Temporary Emergency Court of Appeals has simply taken note of the fact that "§ 207(c) of the Act provides that 'to the maximum extent possible,' but not in every case, [public] hearings be held." *Pacific Coast Meat Jobbers Association v. Cost of Living Council*, 481 F.2d 1388, 1391 (Em. App.1973).[11] These two quotations appear to be the sum total of the judicial pronouncements on this relatively novel and inherently ambiguous phrase, and neither they nor the decisions in the cases in which they were rendered are dispositive of or even helpful to a disposition of the issues in this case.

The legislative history of section 207(c), which shows a congressional preoccupation with the question of whether or not hearings, if held, would be open to the public, is hardly more illuminating. At the time of the enactment of this provision, Congress apparently paid little attention to the question of the conditions in which a hearing would be required. The phrase simply appeared one day in the legislation following an apparently off-the-record compromise session among members of the Senate, unaccompanied by any significant elucidation or comment. Except for matters unrelated to the present issues, it is fair to say that the legislative history is unenlightening as to the intentions of the Congress. See 117 Cong.Rec. 43288, 43667–43673 (1971).

At the same time, the meaning of the phrase is hardly selfevident. Does "possible" mean "feasible within the time frame desired"; is it synonymous with "not impossible"; should it be construed as requiring a hearing in every or practically every situation on the theory that few, if any, procedural requirements are truly impossible to fulfill? The term "to the maximum extent" adds a further and even greater ambiguity, for it can be regarded as either an exhortation or an ironclad rule. Is it, as the Nebraska court said in *Minden Beef, supra*, an invitation to offer excuses for not holding a hearing or a means of emphasizing that they must be held? The final, and in a sense most significant difficulty is that the Congress has failed to declare, or even to provide any clue, on the question of who will decide what is possible and the extent to which it may be so—the President, the courts, or the President to be followed by judicial review.

In the absence of clear guidance either from judicial precedent or from legislative history, the Court must rely on general principles of constitutional law and on a common sense application of separation of powers doctrines. So viewed, it is appropri-

---

10. The court in that case helped to perpetuate the ambiguity by holding that while "hearings on proposed *regulations* prior to their effective date are not required by § 207(c)," "[s]ection 207(c) does, however, require hearings of a formal nature, open to the public, to hear arguments and acquire information on changes in government *policy* regarding prices." 362 F.Supp. at 307 (emphasis added).

11. Both of these decisions intimate that the hearing requirement of section 207(c) could be satisfied by a hearing held *after* the effective date of the proposed price change. See *Minden Beef v. CLC, supra*, 362 F.Supp. at 306–07; *Pacific Coast Meat Jobbers Association v. CLC, supra*, 481 F.2d at 1391. If the section is indeed so limited, it does not help plaintiffs with respect to their present claim.

ate to construe the statute so as to leave it in the first instance to the President to decide whether formal hearings preceding his decision are "possible." Whatever the rule may be with respect to subordinate Executive Branch officials, at least where this kind of procedural decision is entrusted to the head of that Branch, his judgment is entitled to the presumption of reasonableness and hence of validity.[12] In the view of the Court, while that judgment is not—as the government would have it—unreviewable, it may not be overturned by a court except upon evidence that (1) it either lacks a rational basis or (2) the reasons upon which it is based constitute impermissible grounds for official action.[13]

Here, the President was mandated by statute to hold a hearing on decontrol "to the maximum extent possible" and he determined that there would be no prior hearing

> Because advance notice of and public procedure on the decontrol provided by this Order would be likely to cause actions that could lead to economic distortions and dislocations, and would therefore be contrary to the public interest.[14]

The need for preventing probable economic disruption and for avoiding an economic emergency constitute, of course, perfectly permissible reasons for official action and they can hardly be said on their face to lack a rational basis. See *infra*. Plaintiffs contend, however, that the Court should make a determination of the factual validity of the President's conclusions and overturn his action as being without an adequate basis. In support of this argument, they have submitted affidavits in which various eminent economists and others express the opinion that the President's assessment is erroneous. The President's determination, on the other hand, is buttressed by affidavits predicting that a delay in the effective date of Executive Order resulting from notice and hearing procedures "could have caused spot shortages of petroleum products and placed upward pressure on decontrolled prices." [15]

Whoever might ultimately have turned out to be correct on that issue, plaintiffs have at most demonstrated no more than that a difference of opinion exists among experts, in a field hardly celebrated for the reliability of its predictions on issues of this sort, as to the consequences of an advance announcement of decontrol. That kind of showing falls far short of what is required in this situation. See *Pacific Coast Meat Jobbers Association v. CLC, supra,* 481 F.2d at 1391 (prior hearings unnecessary under section 207(c) where they "would have been counter-productive" and "would have aggravated the situation"); *DeRieux v. Five Smiths, Inc.,* 499 F.2d 1321 (Em.App.1974); *Nader v. Sawhill,* 514 F.2d 1064 (Em.App. 1975) ("good cause" present because announcement of a price increase at a future date would have resulted in the withholding of oil from the market).

█ The Court finds that plaintiff has not overcome the presumptively valid presidential determination that a hearing in advance of decontrol was not possible. It follows that there is little likelihood, on the present record, that plaintiff will succeed in demonstrating on the merits that the President's action was invalid under any of the statutory bases asserted.

---

12. There is a presumption that the President's reasons are rationally grounded in fact, and the burden is on the challengers to show otherwise. See *Hampton v. Mow Sun Wong,* 426 U.S. 88, 103, 96 S.Ct. 1895, 1905, 48 L.Ed.2d 495 (1976).

13. That would be true, for example, if these grounds are themselves violative of the Constitution or of a specific statute. See, *e. g., AFGE v. Freeman,* 510 F.Supp. 596 (D.D.C.1981).

14. Executive Order 12287, section 5. In essence, this was a finding of impossibility within the meaning of section 207(c).

15. The government argues in essence that advance notice of decontrol would have provided a powerful economic incentive to those in the petroleum business to avoid selling products that could after decontrol, be sold at a higher price, and that this would necessarily have produced artificial shortages.

4. This leaves the questions of the relative injuries and the consideration of the public interest. In that regard, plaintiffs point to increases in price to consumers of gasoline and heating oil in the several weeks since the issuance of Executive Order No. 12287 as demonstrating the injury they and others have suffered and will continue to suffer as a result of the immediate effectuation of decontrol. That injury appears clearly to exist, for the Court cannot accept the government's highly speculative argument that the price increases stemming from decontrol do not injure plaintiffs because consumer prices might have increased even had controls remained in effect. Yet it also bears noting that plaintiffs have aggravated these injuries by waiting for three weeks after the Executive Order was issued before instituting this action. This delay not only reduces somewhat the weight that may be given to their claims of harm, but more importantly it tends greatly to magnify the injury that a preliminary injunction would inflict on third parties, including those engaged in one form or another in the petroleum business [16] or dependent upon that business, who would now have to readjust to price controls after a month of proceeding on the assumption that such controls had ceased to exist.

The fact is that since January 28, 1981, the economy has operated under decontrolled petroleum prices, and plaintiffs have a heavy burden as they seek to disturb that status quo at the preliminary injunction stage, that is, in advance of a full trial. See *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808–09 (9th Cir. 1963).[17] Heavy weight must also be given to the circumstance that under the law decontrol will occur on September 30 of this year regardless of the outcome of this lawsuit. The effects on the economy from repeated switching—from controlled to decontrolled petroleum prices and back—during a period of but a few months could not fail but to be harmful to the public interest. The dislocations which would inevitably result from such an on-again off-again method of operation [18] in a vital part of the national economy are likely to be both significant and detrimental.[19]

After weighing the relatively insubstantial likelihood that plaintiffs will succeed on the merits, together with the injuries to be suffered by third parties and the public in the event decontrol is enjoined, the Court has concluded that a preliminary injunction should not be granted.

---

16. See Affidavit of Secretary of Energy Edwards.

17. A preliminary injunction issued herein would be valid only until a trial on the merits, and at that juncture a different result could well obtain. Renewed decontrol could also occur if the preliminary injunction were overturned by an appellate tribunal pending its full review of the Court's action.

18. See also note 17 *supra*.

19. The party which seeks a preliminary injunction has the burden of demonstrating that relief is warranted, and that burden is especially heavy where the relief would interfere with the implementation of public acts of national import. See *Yakus v. United States*, 321 U.S. 414, 440-41, 64 S.Ct. 660, 674-75, 88 L.Ed. 834 (1944).