289 F.2d 268
 PEOPLES SECURITIES COMPANY, L. B. Hartgrove, Sr., Robert Macy Compton, Clifford Bryant Renegar, and Union Trust Company, Petitioners,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent.
 No. 18300.
 United States Court of Appeals Fifth Circuit.
 April 20, 1961.
 
 Jack Binion, Houston, Tex., Butler, Binion, Rice & Cook, Houston, Tex., of counsel, for petitioners.
 Joseph B. Levin, Asst. Gen. Counsel, Thomas G. Meeker, Gen. Counsel, S. E. C., Washington, D. C., Walter P. North, Associate General Counsel, Meyer Eisenberg, Attorney, Securities and Exchange Commission, Washington, D. C., for respondent.
 Before RIVES, BROWN and WISDOM, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 The sole question on this appeal is whether the Securities and Exchange Commission acted properly in denying an applicant's motion for withdrawal of its application for registration as a broker-dealer and for dismissal of the administrative proceeding on the application. The case turns on statutory construction and the applicability of Jones v. Securities and Exchange Commission, 1936, 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015. We affirm.
 
 
 2
 The petitioners are (1) Peoples Securities Company, a Texas corporation, (2) L. B. Hartgrove, Sr., Robert Macy Compton, Clifford Bryant Renegar, officers, directors and controlling stockholders of Peoples, and (3) Union Trust Company, a stockholder of Peoples controlled by Hartgrove. Petitioners seek review of an order of the Securities and Exchange Commission, entered under authority of Section 15 of the Securities Exchange Act of 1934, as amended, 15 U.S.C.A. § 78o. The order (1) denied an application of Peoples for registration as a broker and dealer, (2) found Hartgrove, Compton, Renegar, and Union each a cause of the order denying registration, and (3) denied Peoples's motion to cancel or withdraw its application for registration and to dismiss the proceeding.[1] The Commission based its order on findings of willful violation of the statute.[2] These findings are not challenged.
 
 
 3
 The petitioners' contention may be broken down into two parts: (1) Peoples has the absolute right to withdraw its application any time before the effective date of the registration statement and, (2) under the language of the Exchange Act, the Commission is required to cancel the application since Peoples had ceased to do business and was dissolved as a corporation. Before discussing these points it is necessary to review the controlling statutory provisions.
 
 I.
 
 4
 The purpose of the Securities Exchange Act of 1934 (Exchange Act),[3] as stated in its preamble, is to "provide for the regulation of securities exchanges and of over-the-counter markets * * to prevent inequitable and unfair practices on such exchanges and markets". 48 Stat. 881. Section 15 deals with the regulation of the over-the-counter market. Section 15(a) requires brokers and dealers engaged in securities transactions on the over-the-counter market to register with the Commission. Section 15(b) of the Act provides that the Commission shall deny registration to a broker or dealer if the Commission finds that such denial is in the public interest and that the broker-dealer has willfully violated any provision of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq. or of the Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., or of any rule under them, or has willfully made or caused to be made a false or misleading statement in any application for registration or supplemental document.
 
 
 5
 Section 15A of the Exchange Act creates a medium for self-regulation of over-the-counter brokers and dealers. This section provides that national securities associations may be formed to supervise the conduct of their members under Commission registration. The only association registered under Section 15A is the National Association of Securities Dealers, Inc. (NASD). It is important here because NASD rules preclude a member from dealing with a non-member. Membership in NASD is therefore necessary for the profitable participation in underwritings and over-the-counter trading, since members may properly grant concessions, discounts, and other allowances only to other members. Under Section 15A(b) (4) of the Exchange Act, in the absence of the Commission's approval or direction, no broker or dealer may be admitted to or continued in membership in a registered securities association (the NASD), if the broker or dealer (or any partner, officer, director or controlling or controlled person of the broker or dealer) was a cause of an order of denial of registration.
 
 
 6
 The Securities Act of 1933 was an outgrowth of the Pecora investigation of abuses in the investment field. The Act is designed to protect investors against fraud and misrepresentation.[4] By and large, the statute deals with the initial distribution of securities rather than with subsequent trading. Securities offered to the public through the mails or interstate commerce channels must be registered with the SEC by the issuer, and the registration statement must contain certain information, the disclosure of which is intended to protect the public against fraud. The function of the Commission is to assure that the statement is accurate and complete. The Exchange Act differs from the Securities Act primarily in that it applies to post-distribution trading. The Exchange Act has three basic purposes: to require dealers to disclose certain basic information to the investing public; to regulate the securities markets; and to control the amount of the nation's credit that goes into those markets. All stock exchanges must register with the SEC (unless exempted by the Commission), and no security may be listed on an exchange unless its issuer files an application for registration both with the exchange and with the SEC. The application contains information similar to that required by the Securities Act for new issues. Over-the-counter brokers and dealers must also register with the Commission, maintain records and file statements of financial condition.
 
 
 7
 The legislation accomplishes its aims by the requirement of registration and by an anti-fraud provision, enforceable by injunction and criminal sanctions. The anti-fraud provision, Section 17, applies whenever a security is sold by use of the mails or interstate commerce channels. The registration provision, Section 5, is designed to give investors adequate and accurate information in the form of a "registration statement" that is a public record for twenty days. Originally, this twenty-day period was to give the public an opportunity to inform itself; there were to be no sales during this time. Underwriters and dealers were to furnish prospective investors with a brochure based on the information in the registration statement. Although the basic pattern of the statute is still the same, the statute was amended in 1954 to permit certain kinds of offers (but not sales) during the twenty-day waiting period.
 
 II.
 
 8
 Petitioners rely on Jones v. Securities and Exchange Commission, 1936, 298 U.S. 1, 56 S.Ct. 654, 663, 80 L.Ed. 1015, as authority for an applicant's absolute right to withdraw a registration application. In Jones the Supreme Court held that as a matter of right a registration statement under the Securities Act of 1933 may be withdrawn before its effective date, at least when no rights of investors are involved. The decision appears to give the registrant the power to terminate the Commission's jurisdiction to investigate the correctness and completeness of a statement.
 
 
 9
 The Jones case was one of the major defeats of New Deal legislation. In assailing the action of the Commission, Mr. Justice Sutherland, organ of the Supreme Court, compared the Commission's investigation to the `intolerable abuses of the Star Chamber". Mr. Justice Cardozo, dissenting, suggested, "Historians may find hyperbole in the sanguinary simile". The Jones decision has never been overruled. But history — or Congress — has indeed found the simile hyperbolic.[5]
 
 
 10
 Jones was engaged in selling oil royalties. He filed a registration statement with the Commission covering a proposed issue of participating trust certificates. The statement would have become effective at the end of twenty days. 48 Stat. 74, amended, 48 Stat. 905 (1934), 15 U.S. C.A. § 77a et seq. The Commission questioned the truth and sufficiency of his statement. The day before the registration would have become effective, the Commission instituted stop order proceedings and issued a subpoena duces tecum to Jones commanding him to appear and testify and to produce certain records at the hearing. He then appeared by counsel and attempted to withdraw his statement. The Commission refused to allow him to withdraw, in conformity with its regulation forbidding withdrawal without the Commission's consent and a finding that the withdrawal is "consistent with the public interest and the protection of investors[6]". The Supreme Court held that Jones had the right to withdraw his registration and the Commission had no power to continue with the investigation. The Court based its holding on the ground that the registration was not yet effective; consequently any further inquiry by the SEC would constitute a "fishing expedition". The Court analogized the right to withdraw the registration statement with the rights of plaintiffs in proceedings before the courts. The majority held that a stop order proceeding was analogous to a suit in equity for an injunction. Except where dismissal might prejudice the defendant, a plaintiff has the absolute right to dismiss his bill without prejudice; there was no prejudice, because the withdrawal produced the same result as a stop order. The Court did not decide the validity of the Commission's regulation, but found that public interest in the matter of Jones's withdrawal was non-existent because no investor would be prejudiced.
 
 
 11
 Knaves in the securities business have found that the shifting sands of legislation and judicial interpretation have made Jones a shrinking oasis in a large desert.[7] The SEC promptly construed Jones as inapplicable to withdrawals after the effective date of registration when part of an offering has been sold to the public.[8] A few years later the SEC held that even when none of the securities covered by an effective statement have been sold, the public interest in the integrity of such a statement precludes any absolute right of withdrawal.[9] The federal courts have supported the Commission's position limiting the Jones rationale to cases where withdrawal of the application is sought before the effective date — although the justification for this distinction is difficult to discern, if there is an absolute right to withdraw.[10] See, for example, Oklahoma-Texas Trust v. S. E. C., 10 Cir., 1939, 100 F.2d 888; Resources Corporation International v. S. E. C., 1939, 70 App.D.C. 58, 103 F.2d 929; S. E. C. v. Hoover, D.C.N.D.Ill.1938, 25 F.Supp. 484.
 
 
 12
 More important than the decisional development was congressional action completely changing the conditions on which the vitality of Jones depends. The Securities Act of 1933 prohibited the applicant from offering for sale the securities filed for registration until the effective date of the registration. 48 Stat. 77 (1933). In 1954, Congress amended the Act to permit applicants to make offers for sale and to solicit offers to buy during the period after filing but before the registration becomes effective. 15 U.S.C.A. § 77e(a, c), 68 Stat. 684 (1954). As this Court pointed out, under the law as it now exists as a result of these 1954 amendments, public interest in the contents of a statement arises immediately upon filing and precludes any absolute right to withdraw. Columbia General Investment Corp. v. S. E. C., 5 Cir., 1959, 265 F.2d 559.[11]
 
 
 13
 In Columbia the petitioner filed a registration statement with the SEC for an issue of corporate stock. Shares of the same class as those being registered were widely held by members of the public. Because of repeated amendments, the statement had not yet become effective nearly three months after it was filed initially. The petitioner then sought to withdraw its registration statement. The Commission denied the application, held a hearing, and issued a stop order. This prevented the statement from becoming effective and indicated its unreliability. 15 U.S.C.A. § 77h(d). This Court affirmed the order of the Commission. At that time the Commission urged the Court to treat Jones as impliedly overruled. It was not necessary for us to do so, because there were substantial grounds for distinguishing Jones from Columbia. In Jones the Court emphasized the fact that there were no investors, existing or potential; in Columbia General there were 1,800 members of the public who held over 63,000 shares of the class securities covered by the registration statement. We held unequivocably, however, that the law was changed significantly as a result of the 1954 amendments to Section 5 of the Securities Act.[12] 15 U.S.C.A. § 77e. Because of these amendments, allowing a registrant to make offers for sale and to solicit offers to buy after filing but before the registration statement becomes effective, if a registrant were to have "the unfettered right to withdraw up to the effective date, the machinery of the Commission, established by Congress to provide truth and honesty in securities, may become the very instrument of deception and fraud. Those engaged in enterprises to bilk either the stupid, the credulous, or the intelligent who may be overly persuaded by optimistic propaganda, will, in exploiting the show of legality which the filing affords, find no difficulty in overcoming the impediment to a final sale which withdrawal brings about." 265 F.2d 559, 563.
 
 
 14
 Grasping the nettle, the Commission recently found that the 1954 amendments prevented absolute withdrawal in a case that, on the facts, was virtually the same as Jones. In Matter of Comico Corp., Securities Act Release No. 4050 (April 27, 1959),[13] decided just three weeks after Columbia, the Commission found it unnecessary to rely on the need to protect existing investors. The Commission, in declining to follow Jones, stated that "the effect of the filing of a registration statement which was made by the 1954 amendment to Section 5 of the Act creates a public interest upon filing which precludes an absolute right of withdrawal".
 
 
 15
 If an applicant has an absolute right of withdrawal, he may capitalize on the aroma of legality afforded him by filing the registration statement. Allowing one day for withdrawal, he would have nineteen days in which to exploit credulous investors. And, because of delaying amendments postponing the effective date of the registration statement, he might have additional time for chicanery. An unscrupulous registrant might file a statement and distribute a fraudulent or incomplete prospectus, then sell shares at a high price reflecting the optimism generated by the false or incomplete representations. According to petitioners, to escape his fraudulent activities, the registrant would have only to withdraw his statement and thereby foreclose an investigation. Or, he might issue a fraudulent or incomplete prospectus, withdraw his application, and then promote his sales without utilizing interstate commerce or the mails — immunizing himself from the federal act. In this manner, even if there were no shares outstanding, the Act might be circumvented and its purposes frustrated. In short, an unqualified right of withdrawal would immunize an unscrupulous registrant from prosecution for filing a false or incomplete prospectus.
 
 
 16
 In the light of the 1954 amendments and the more recent judicial decisions, we consider that Jones has no application when withdrawal would frustrate the purposes of the Act, cripple the investigative functions of the SEC, and allow the registration procedure itself to be used for fraud or deception. We hold, therefore, that an applicant has no absolute right to withdraw his registration statement after it has been filed — whether or not there are existing investors.
 
 III.
 
 17
 Jones and Columbia General arose under the Securities Act, especially Section 5. This case arises under the Exchange Act. The last sentence of Section 15(b) of the Exchange Act provides that: "If the Commission finds that any registered broker or dealer, or any broker or dealer for whom an application for registration is pending, is no longer in existence or has ceased to do business as a broker or dealer, the Commission shall by order cancel the registration or application of such broker or dealer." (Emphasis added.) The petitioners contend that, since Peoples had ceased to do business and was dissolved, the Commission acted in violation of the "plain language" of Section 15(b) in denying cancellation of Peoples's application for registration. They argue that the word "shall" is mandatory, not permissive, and that therefore the Commission was required as a ministerial duty to cancel the application.
 
 
 18
 As commonly used, of course, the word "shall" does connote an imperative obligation as opposed to a discretionary action. But even in the only case cited as authority by the petitioners, Escoe v. Zerbst, 1935, 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566, the Supreme Court observed that the mandatory or permissive character of the word depends upon its statutory setting, upon "a view of [its] ends and aims." 295 U.S. 490, 493, 55 S.Ct. 818, 820. In Richbourg Motor Co. v. United States, 1930, 281 U.S. 528, 534, 50 S.Ct. 385, 387, 74 L.Ed. 1016, cited in Escoe v. Zerbst, the Court observed, "Undoubtedly, `shall' is sometimes the equivalent of `may' when used in a statute prospectively affecting Government action". The word "shall" must be read within the context of the statute, to further, not frustrate, the generally expressed legislative policy. See S. E. C. v. C. M. Joiner Leasing Corp., 1943, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88. Here, Section 15(b) also provides that the Commission "shall" deny an application if it is in the public interest and the applicant is subject to one of the disqualifications enumerated in the section. The petitioners would have the little word "shall" carry a heavy load, a load out of character and inconsistent with the statutory scheme and the general purpose of the Exchange Act. As we see it, the quoted sentence, coming at the end of the section, is intended as a provision for getting rid of "dead wood" in the Commission's files. See Loss, Securities Regulation 751 (1951). It in no way restricts the Commission's authority to conduct remedial disciplinary proceedings.
 
 
 19
 The fact that a company has dissolved does not render moot the purpose of the administrative proceedings. The Exchange Act contains an express regulatory pattern, or statutory scheme, in Sections 15(b) and 15A(b) (4), by which important consequences attach to denial of registration, to findings of willful violations, and to findings naming persons as a cause of a denial order. These consequences affect the future status of an applicant, its officials, and controlling stockholders, who may be excluded or restricted in their investment activities. Section 15A(b) (4), for example, carries heavy economic sanctions in declaring a broker or dealer ineligible for membership in NASD, if the broker or dealer is a cause of any order denying registration under Section 15(b).
 
 
 20
 In order to make the regulatory pattern effective, the disqualifications extend not only to broker-dealer partnerships and corporations, which may be readily organized and dissolved, but also to any person affiliated with brokers or dealers whom the Commission finds to have been a cause of an order denying registration. Later, if such a person should seek to return to the securities business, the findings with respect to his violations would be res judicata in any proceeding brought against him under Section 15(b). In the present case the Commission found that Hartgrove, Compton, Renegar, and Union were each a cause of the denial of Peoples's registration. The Commission's determination could not have been made if withdrawal had brought the administrative proceedings to an abrupt end.
 
 
 21
 In our view, Section 15(b) authorizes the Commission to cancel a registration or application and clear its records when the broker or dealer is not the subject of a disciplinary proceeding. It does not compel the Commission to do so. The petitioners' interpretation would nullify the effectiveness of the entire regulatory scheme designed to protect investors against injury at the hands of persons guilty of misconduct under the securities laws. The securities acts are meant to reach the knave, not to punish for a specific act of knavery. "There is quite a distinction in the position of one who could say, `I resigned', and one who says, `I was expelled.'" Guaranty Underwriters, Inc. v. Johnson, 5 Cir., 1943, 133 F.2d 54. Cf. Neustein v. Mitchell, D.C.S.D.N.Y.1943, 52 F.Supp. 531.
 
 
 22
 We hold that the Commission's denial of Peoples's application for registration as a broker and dealer under Section 15(b) of the Exchange Act, and the finding that Hartgrove, Compton, Renegar and Union are causes of the denial for purposes of Section 15A(b) (4) of the Act, were proper. The Commission correctly refused to dismiss the administrative proceeding: the petitioners had no absolute right to withdraw their application, and the Commission was under no mandatory duty to cancel the application after Peoples was dissolved as a corporation.
 
 
 23
 "Recklessness and deceit do not automatically excuse themselves by notice of repentance."[14] The order of the Commission is hereby
 
 
 24
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 In November 1956 Peoples was incorporated for the purpose of underwriting a proposed $100,000,000 public offering of shares of American Provident Investors Corporation ("APIC"). March 28, 1957, Peoples filed with the Commission an application for registration as a broker and dealer. With the consent of Peoples, the effective date of the registration was postponed. The registration never became effective. April 25, 1957, the Commission, with Peoples's consent, ordered a postponement until May 24, and on May 23, the effective date was ordered postponed until further order of the Commission. October 31, 1957, the Commission issued a notice of public administrative hearings and proceedings, under Section 15(b) of the Exchange Act, to determine whether Peoples's application for registration should be denied because of alleged violations of the Act, and to determine whether Hartgrove, Compton, Renegar, and Union were each a cause of any order of denial that might be entered
 December 3, 1957, Peoples filed an application for withdrawal of its application for registration, and on this basis moved to dismiss the proceeding. January 6, 1958, Peoples filed a motion to cancel its application for registration and to dismiss the proceedings on the ground that it had filed articles of dissolution December 30, 1957, and that the Secretary of State of Texas had issued a certificate of dissolution of Peoples as a corporation. January 31, 1958, the Commission issued a Memorandum Opinion and Order denying Peoples's motions as being inconsistent with the public interest and the protection of investors. April 7, 1958, Peoples filed pleadings in response to the Commission's Order for Public Proceedings and Notice of Hearing, and again prayed for leave to withdraw its application. Peoples asserted its right to cancellation of the application and dismissal of the proceeding. The Commission, however, went forward with the hearings. April 7-8, 10-11, 14-18 and June 9-10, 1958, hearings were held before a hearing examiner. At the conclusion of the evidence Peoples again moved to withdraw and cancel its application and for dismissal of the proceedings. February 10, 1960, the Commission denied Peoples's application for registration as a broker and dealer and its motions to cancel or withdraw its application and dismiss the proceedings. The Commission found that Hartgrove, Compton, Renegar and Union were each a cause of the order denying the application. The petitioners seek to set aside this Order of February 10, 1961.
 
 
 [2]
 The Commission's denial of Peoples's application for registration as a broker and dealer under Section 15(b) of the Exchange Act, and the finding that Hartgrove, Compton, Renegar and Union are each a cause of the denial for purposes of Section 15A(b) (4) of the Act, are based on the following uncontested findings of violation: 1. That in violation of Section 15(b) of the Exchange Act and Rule 15b-2 thereunder Peoples willfully made false and misleading statements of material facts in its application for registration and in two amendments thereto, and that Hartgrove, Renegar and Compton caused and/or aided and abetted in these violations; 2. That Hartgrove, Compton, Union and Sequoyah Securities Company, the latter two being controlled by Hartgrove, made false and misleading statements in the offer and sale of securities in willful violation of the anti-fraud provisions in Section 17(a) of the Securities Act; 3. That Hartgrove and his controlled companies, Union and Sequoyah, willfully violated Section 5 of the Securities Act in the offer, sale and delivery of securities as to which no registration statement had been filed; 4. That Union, aided and abetted by Hartgrove, acted as a broker and dealer without registration in violation of Section 15(a) of the Exchange Act
 
 
 [3]
 In general, see Loss, Securities Regulation, Chap. 7, 19(b) (1951; Supp. 1955); Tracy and McChesney, The Securities Exchange Act of 1934, 32 Mich. L.Rev. 1025 (1934)
 
 
 [4]
 The purpose of the act is "to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion; to restore the confidence of the prospective investor in his ability to select sound securities; to bring into productive channels of industry and development capital which has grown timid to the point of hoarding; and to aid in providing employment and restoring buying and consuming power." S.Rep. No. 37, 73rd Cong., 1st Sess. (1933). Eight months after the Securities Act became law, President Roosevelt sent a second message to Congress recommending "the enactment of legislation providing for the regulation by the Federal Government of the operations of exchange dealing in securities and commodities for the protection of investors, for the safeguarding of values, and, so far as it may be possible for the elimination of unnecessary, unwise, and destructive speculation." S. Rep. No. 792 at 1-2 and H.R.Rep. No. 1383 at 1-2, 73rd Cong., 2d Sess. (1934). In response, Congress enacted the Securities Exchange Act of 1934, approved by the President June 6, 1934, becoming Public Law No. 291, 73rd Cong., 2d Sess
 
 
 [5]
 Loss points out that the "Jones case is not nearly so significant for its holding as it is to historians of the Supreme Court." Loss, Securities Regulation 200 (1951). He notes that "[m]ore recent views are considerably more tolerant of the administrative process. Cf. United States v. Morgan, 307 U.S. 183, 191 [59 S.Ct. 795, 83 L.Ed. 1211] (1939); United States v. Morton Salt Co., 338 U.S. 632, 642 [70 S.Ct. 357, 94 L.Ed. 401] (1950)." Id. n. 228
 
 
 [6]
 Then rule 960, now 17 C.F.R. § 230, 477 (1949; Supp. 1959)
 
 
 [7]
 Mr. Justice Cardozo, dissenting in Jones: "To permit an offending registrant to stifle an inquiry by precipitate retreat on the eve of his exposure is to give immunity to guilt; to encourage falsehood and evasion; to invite the cunning and unscrupulous to gamble with detection. If withdrawal without leave may check investigation before securities have been issued, it may do as much thereafter, unless indeed consistency be thrown to the winds, for by the teaching of the decision withdrawal without leave is equivalent to a stop order, with the result that forthwith there is nothing to investigate. The statute and its sanctions become the sport of clever knaves." Mr. Justice Jackson, discussing Jones in Struggle for Judicial Supremacy, 152 (N.Y., 1949), wrote: "Every tricky knave in the investment business hailed the opinion. * * *"
 
 
 [8]
 National Boston Mont. Mines Corp., 1 S.E.C. 639 (1936); Sunset Gold Fields, Inc., 2 S.E.C. 329 (1937); Treasure Hill Extension Mines Co., 2 S.E.C. 134 (1937). For more recent expressions of the Commission's position, see F. W. Horne, 38 S.E.C. 104 (1957); Indiana State Securities Corp., 38 S.E.C. 118 (1957); G. W. Chilian & Co., 37 S.E.C. 384 (1956)
 
 
 [9]
 Winnebago Distilling Co., 6 S.E.C. 926, (1940). See also Paper Sales Co., 2 S.E.C. 748 (1937)
 
 
 [10]
 See note 7. See also Loss, Securities Regulation 202 (1951); Note, 84 U.Pa. L.Rev. 1019 (1936)
 
 
 [11]
 See note, 58 Mich.L.Rev. 780 (1960)
 
 
 [12]
 In Columbia this Court also observed that under Rule 253(c) of Regulation A, 17 C.F.R. § 230.252(c) (Supp.1958), adopted after Jones, the issuance of a stop order bars for five years the use of the $300,000 exemption from registration requirements. Withdrawal would frustrate this rule. It could not be said, therefore, as the Supreme Court said in Jones, that withdrawal accomplishes everything a stop order accomplishes
 
 
 [13]
 Noted, 45 Va.L.Rev. 1061 (1959)
 
 
 [14]
 Mr. Justice Cardozo dissenting in Jones v. Securities and Exchange Commission, 1936, 298 U.S. 1, 56 S.Ct. 654, 663, 80 L.Ed. 1015, 1028