In re Le Roy RENNELS, Debtor.

In re Daryl Lamont MITCHELL, Debtor.

In re John R. & Lillian J. CARTER, Debtor.

In re Armond L. GOLDSTEIN, Debtor.

In re Christopher & Carol BUSH, Debtor.

In re Ronald E. CROSS, Debtor.

In re Brent & Melody RIGGS, Debtor.

In re Christopher & Whitney CHANDLER, Debtor.

In re Timothy Ray HATLER, Debtor.

In re Carl & Willie HARRIS, Debtor.

In re Veachel & Donna CLINE, Debtor.

In re Ernest & Gladys Faye CROSS, Debtor.

In re Larry & Shirley PHILLIPS, Debtor.

In re Ernest & Jackie Joe GILBERT, Debtor.

In re Robert Allen MOON, Debtor.

Bankruptcy Nos. 38301364, 38301360, 38301369, 38301712, 38301820, 38301823, 38301863, 38301916, 18300373, 18300381, 18300383, 18300395, 18300402, 48300181 and 48300313.

United States Bankruptcy Court, W.D. Kentucky.

Jan. 20, 1984.

J.R. Bartholomew, Louisville, Ky., for Le Roy Rennels.

Donna N. Clements, Louisville, Ky., for Daryl Lamont Mitchell.

Ellen Friedman, Louisville, Ky., for John R. Carter (Lillian).

J. Gregory Joyner, Louisville, Ky., for Armond L. Goldstein.

Thomas A. McAdam, III, Louisville, Ky., for Christopher Bush (Carol).

Richard H. Shuster, Louisville, Ky., for Ronald E. Cross.

Jan C. Morris, Louisville, Ky., for Brent Riggs (Melody).

Donald L. White, Louisville, Ky., for Christopher Chandler (Whitney).

F. Hampton Moore, Jr., Bowling Green, Ky., for Timothy Hatler.

Lawrence F. Smith, Radcliff, Ky., for Carl Harris (Willie).

John W. Goodman, Munfordville, Ky., for Veachel Cline and Donna Cline.

Cabell D. Francis, Stanford, Ky., for Ernest Cross (Gladys).

Robert M. Alexander, Glasgow, Ky., for Larry Phillips (Shirley).

Stanley Suggs, Henderson, Ky., for Ernest Gilbert (Jackie).

Roger A. Cooper, Owensboro, Ky., for Robert Allen Moon.

## MEMORANDUM OPINION

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

The likely effect of our opinion today will be to reduce by more than eighty per cent the number of discharge hearings in the Western District of Kentucky. Because we deal with a statute which apparently would deny that outcome, the result can obtain only with a lengthened reach of creative interpretation. To the extent that our exercise departs from what could be called a tradition of strict constructionism in this district, we will move with measured pace, using only the standard juristic tools of statutory construction; legislative intent, simple grammatical definition, case law analysis and applied jurisprudence.

Before the Court are numerous motions by debtors asking to be excused from their discharge hearings. The reasons given are diverse, but they may be largely grouped into three categories of problems: health, geography and employment. None of the movants want to reaffirm debts, redeem property, or avoid liens. The motions are therefore not controverted, nor could they reasonably be; the debtors' only adversary in the matter at hand is the hearing system itself.

Bankrupt debtors are a woebegone lot. In addition to the matters of strict legal compliance required of them by the bankruptcy process, they are confronted with other bankruptcy-related demands. Many, if not most, are in the process of changing spouses, jobs, homes, states of residence, guiding philosophies of life, or all of these; many have health problems, physical or mental, causally connected to their financial failure. These concerns, too, require their attention. Thus at any given time there are numerous motions pending similar to those we now consider.

Heretofore we have either summarily overruled such motions, continued the debtor's discharge hearing to a future docket date, or transferred the case to another jurisdiction for the limited purpose of the discharge hearing. The motions now at hand will all be granted, on conditions we will explain.

Section 521(4) of the Bankruptcy Code requires debtors to appear at discharge hearings, and Section 524(d), in the most affirmative possible language, requires the Court to conduct such hearings and at them to advise debtors of certain of their post-bankruptcy rights and duties, and of the implications of contractual duties voluntarily reaffirmed during bankruptcy.

As it has evolved, the discharge hearing is a sort of mustering-out ceremony for debtors at which time they are read what amounts to a financial *Miranda* warning. We will defer a detailed analysis of the discharge hearing requirements of Section 524 only long enough to describe the setting and manner in which the law is implemented.

\* \* \* \* \* \*

On five days each month one of the two judges of this district conducts discharge hearings. Each debtor brings an attorney, and frequently a spouse and children. Creditors attend. The main bankruptcy courtroom in this district seats 40 people. To accommodate the crowds and expedite the hearings, we schedule 20 cases per docket on a continuing series of dockets at 20-minute intervals throughout the day. In this manner we handled last year about

4,000 separate cases, many of which involved two debtors, husband and wife.

The Court begins each session by advising the debtors of their rights and duties, in a speech that tracks precisely the substantive content of Section 524 but is given in the simple, clear idiom of the nonlawyer. Individual cases are then called; debtors approach the bench. If the case involves reaffirmation agreements, motions for the redemption of property or avoidance of liens, or some last-minute refinement of the petition or subsequent pleadings which requires actual attention by the Court, it is given. If debtors have no substantive matters to be considered—and more than eight out of ten do not—they are immediately excused. At the rate of twenty cases every twenty minutes, considering the time consumed by the Judge's speech at the outset and his consideration of the few legal questions presented, each debtor stands before the bar of justice for a matter of seconds, less than one full minute. Many do not even stop walking. As they depart somewhat quizzically they are overheard to ask their lawyers, "Is that it?" or "What happened?" to which the lawyers invariably respond by indicating with a nod or a murmur that they will explain outside the courtroom what it was that transpired there. With dockets rotating every twenty minutes on through the day, with 50 to 60 people going out and 50 to 60 others coming in, the courtroom and halls fill with the tension and detritus generated by large crowds in small places. Bailiffs work to smooth the flow of humanity; crutches, wheelchairs and small children frequently impede their efforts.

So much for the majesty of the law, as witnessed by many who have never been, and may never again be, inside a federal courtroom.

Twelve thousand dollars a day in lost wages and fees to debtors and attorneys is the cost of this exercise, in this district.[1] We have not estimated the costs of courtroom space or judicial and clerical time which could be put to more productive use. As we work our way through the discharge hearings, the stack of cases under submission grows. Substantial and intricate issues of commercial law involving many millions of dollars are deferred while businesses in Chapter 11, their employees and creditors await decisions as to whether those businesses will continue or close.

Discharge hearings occupy the greater part of five days a month, or about ten per cent of the judge-time available during normal office hours in this two-judge district. If we were to perceive as more demanding our duties under Section 524 and conduct even more methodical and elaborate discharge ceremonies—say by doubling the individual attention devoted to each case, from one minute each to two minutes each—discharge hearing activity would consume 20 per cent of available judge-time; four minutes per case in discharge hearings would occupy 40 per cent of our normal business hours, and so on.

These, then, are the observations that have occurred to us from time to time in the handling of 18,000 discharge hearings over the past four years. Insanity threatens.

\* \* \* \* \* \*

As statutes go, Section 524 of the Bankruptcy Code is clear to the point of being

---

1. The $12,000 estimate is, if anything, conservative. It assumes that debtors will miss a full day's work at $3.50 per hour; that there are working husbands and wives in just under half of the 4,064 cases processed last year; and that lawyers will spend 1.5 hours, door-to-door, with each client at $66 per hour (less than the prevailing hourly rate). The calculation assumes 48 discharge hearing-days per year. Based on these assumptions, the total noncompensable lost time to debtors on an annual basis would be $165,000, and lost legal fees would be $406,000. An element of risk not measurable is that many debtors, particularly those with new jobs, actually jeopardize their employment by their absence.

The most outrageous case we have observed was a young couple in Paducah who since the first meeting of creditors had found new jobs in California. They drove from California to Paducah (4 days) and back (4 days) for a total of 16 working days lost for their minute before the Judge.

blunt. That it is mandatory in nature is put beyond doubt by the use of the word "shall" no fewer than four times in one subsection. The statute is worth quoting here.

> (d) In a case concerning an individual, when the court has determined whether to grant or not to grant a discharge under section 727, 1141 or 1328 of this title, the court *shall hold a hearing* at which the debtor *shall appear in person.* At such hearing, the court *shall inform the debtor* that a discharge has been granted or the reason why a discharge has not been granted. If a discharge has been granted and if the debtor desires to make an agreement of this kind specified in subsection (e) of this section, then at such hearing the court *shall —*
>
> (1) *inform the debtor —* (that he is not required by any law to make the agreement, and of the legal consequences of his breach of it). (Emphasis supplied).

The very strength of the language gives pause to the reader to inquire: What is the nature of the interest deemed worthy of such impenetrable protection? If statutes are to be read like a foreign language, as Justice Frankfurter said, with all of their "associations, echoes and overtones,"[2] to what echo of abuse should we be attuned?

The answer is, of course, the debtor's right to a perfectly fresh start, undisturbed by any coercive pressure whatsoever from creditors to reaffirm pre-existing debt. The pattern of abuse addressed by Congress was that of creditors using their superior bargaining power, and preying on their debtors' guilt and sense of moral obligation, to harness them with oppressive debt for the necessities of life. The legislative intent underlying § 524(d) is so vividly clear and so harmonious with the theme of rehabilitation that supports the entire Code, that one need not even consult the printed record to discover it, although there is abundant evidence of the obvious to be found there.[3]

With the clear intent of Congress we are in singular accord. By holding today that debtors may be excused from discharge hearings, considering the conditions we will impose, we do not indignity to that intent, and may even strengthen the broader statutory objective of a "fresh start."

But intent is one thing, and execution is another. The principal objective of Section 524(d), it will be remembered, was to erect one final bulwark in protection of the debtor's right to begin anew, one last obstacle to the avaricious creditor, in the person of the judge himself.

Not surprisingly, perhaps, considering the enterprise and dedication of creditors, the medium of the discharge hearing has been turned to their advantage. Because the debtor is *required* to be at the hearing, creditors eagerly gather there, reaffirmation agreements in hand, for signature and approval. By local rule we require signed reaffirmation agreements to be filed five days before the hearing; but because of various delays, by debtors and also due to the bureaucratic workings of institutional creditors, many are not timely signed. Out of fairness to all we freely permit the agreements to be signed in open court, because the debtor's consent could not be more apparent. Despite firm warnings from the bench, he invariably signs anyway, under the subtle duress of public expectation.

Thus we may say that the primary *intent* of § 524(d) is diluted to some extent by its very *execution* in the statutorily prescribed manner.

The enforced conduct of discharge hearings runs contrary to another important intent of the Bankruptcy Code, which is to remove judges from the performance of purely ministerial and clerical functions, to free their time for substantive adjudica-

---

**2.** Frankfurther, "Some Reflections on the Readings of Statutes", 47 Colum.L.Rev. 527 (1947).

**3.** For example, according to the committee reports read into the Congressional Record, the 524(d) hearing is to be held whether or not the debtor desires to reaffirm any debts. 124 Cong.Rec.H. 11,096 (daily ed. Sept. 28, 1978); S. 17,514 (daily ed. Oct. 6, 1978).

tion.[4] Accurately foreseeing an increased resort to bankruptcy relief under a liberalized code structure, the draftsmen freed us from such duties, for example, as presiding at first meetings of creditors, a function now delegated to the clerk of court. In fact, a judge's presence at the first meeting, as under preexisting law, would serve a more substantive purpose than holding discharge hearings; in the former type of proceedings, at least, a judge is enabled to get an early "feel" for the entire case and where it is likely to go. By comparison, the conduct of discharge hearings is nothing but brainless ritual, simple-minded puppetry.

Section 524(d) is no Cabala whose mysteries may be summoned up only by a robed priest. Were that to be the case, we doubtless could more profoundly impress its lessons upon the minds of debtors if we were all of us to chant it together in a darkened courtroom, to the accompaniment of the rubbing of old stones, the burning of scented oil, and the chewing of mandrake root. In reality § 524 is nothing more than a simple, straightforward outline of those lessons of contract duties and consequences the knowledge of which is imputed by the law to all adults. There is, to be short, no reason why this purely informational function of the court should not be responsibly delegated to attorneys as officers of the court.

\* \* \* \* \* \*

Thus far we have seen at least two important ways in which the procedural mandate of § 524(d) frustrates its own intent[5]—by impairment of the debtor's "fresh start" through the imposition of unnecessary expense, lost wages and danger

to new employment, and by favoring creditors with a last and best chance to obtain that which the law discourages, the reaffirmation agreement. We will now consider the grammatical content of § 524(d), to determine whether it actually requires what it appears to require.

The word "hearing" is defined by *Black's Law Dictionary* as a:

> Proceeding of relative formality, generally public, with definite issues of fact or of law to be tried, in which parties proceeded against have right to be heard, and is much the same as a trial and may terminate in final order... Synonymous with trial, and includes reception of evidence and arguments thereon." [6]

Decisions of the Second and Seventh Circuit Courts of Appeals emphasize the necessary components of a "hearing"; there must be *issues* upon which *action* is taken:

> A hearing presupposes a formal proceeding upon notice with adversary parties, and *with issues* on which evidence may be adduced by both parties and in which all have a right to be heard." [7]

. . . . .

> On the other hand (as compared to an "investigation"), in a hearing there are parties, and issues of law and of fact to be tried, and at the conclusion of the hearing *action is taken* which may materially affect the rights of parties." [8]

Further we need not go. Following the accepted definitions, we hold that in that great majority of § 524 appearances which present no issues, substantive or otherwise, the § 524(d) "hearing" is not a hearing at all. It is an exposition.[9]

---

**4.** Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93–137, 93d Cong., 1st Sess. (1973) pp. 5, 92–94; H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977) pp. 89–91, 331, U.S.Code Cong. & Admin.News 1978, p. 5787.

**5.** Here we view § 524(d) strictly from the debtor's standpoint; we need explore no further the congressional intent to free judges from administrative chores.

**6.** Black's Law Dictionary, p. 852 (4th Ed.Rev. 1968).

**7.** *In re Securities and Exchange Comm.,* 84 F.2d 316, 318 (2d Cir.1936). (Emphasis supplied).

**8.** *Bowles v. Baer,* 142 F.2d 787, 789 (7th Cir. 1944). (Emphasis supplied).

**9.** In connection with a recently concluded audit, the Administrative Office of the United States Courts has recommended that we expedite the issuance of discharges to a time *in advance of* the discharge hearing. The recommendation would render the discharge hearing

Nor, as we will see, is the use of the word "shall" quite as mandatory as it might appear. Consider this analysis, from the Fifth Circuit:

> As commonly used, of course, the word "shall" does connote an imperative obligation as opposed to a discretionary action. But even in (Supreme Court citations omitted), the Supreme Court observed that the mandatory or permissive character of the word depends on its statutory setting upon "a view of its ends and aims" . . . The word "shall" must be read within the context of the statute *to further, not frustrate, the generally expressed legislative policy.*[10]

Or this, from the Ninth Circuit:

> The word "shall" in a statute may sometimes be *directory only,* whereas the word "may", seemingly less forceful, may be mandatory. . . . *Is the requirement* (imposed by the word "shall") under consideration *material or immaterial?* Is it a matter of *convenience, or substance?*[11]

As recently as 1983 the Supreme Court has instructed us that in giving definition to the words "shall" and "may", courts must apply "the even more important principle of statutory construction that Congress should not lightly be assumed to have enacted a statutory scheme foreclosing a court of equity from exercise of its traditional discretion."[12]

These are not the words of semanticists playing at the language as art. These are high courts of law solving hard problems with common sense. They are not isolated examples.[13] We learn from them.

But while learning generally from these nonbankruptcy illustrations of statutory construction, we would be imprudent not to pay heed also to such case law as has developed specifically interpreting the language of § 524(d). Six cases have been reported.

So clear is the statutory language, one would think it unlikely that a judge would bother to write an opinion saying that it says what it says. Yet one judge did exactly that. The bankruptcy court for the Southern District of Alabama abruptly dismissed a bankruptcy petition, for failure to attend the discharge hearing, of a man permanently confined to a nursing home because of a crippling stroke. The court in *In re Martin* was unable to find in the statute "any room for the application of equity," and held that to grant an excuse in the absence of statutory latitude would be "nothing more or less than judicial legislation."[14] The case stands for the proposition, we may presume, that a poor man should avoid having a stroke in the Southern District of Alabama.[15]

The remaining five decisions created special exceptions for hardship cases. The first reported case to consider the statute, *In re Garber,* called the compulsory attendance feature of § 524(d) an "unusual requirement", commenting that "the reason for requiring a debtor, who does not propose to reaffirm any debt to appear in court to be informed of his rights escapes me, (sic) especially when we consider that the debtor has already lost one day away from work to attend the meeting of creditors . . . ."[16]

even less meaningful, if that is possible. Report of Nov. 25, 1983.

**10.** *Peoples Securities Co. v. Securities and Exchange Comm.,* 289 F.2d 268, 274 (5th Cir. 1961). (Emphasis supplied).

**11.** *Wilshire Oil Co. of California v. Costello,* 348 F.2d 241, 243 (9th Cir.1965). (Emphasis supplied).

**12.** *United States v. Rodgers,* —— U.S. ——, 103 S.Ct. 2132, 2150, 76 L.Ed.2d 236 (1983).

**13.** *See* the Supreme Court opinions cited in *Peoples Securities* and *Wilshire Oil,* supra; see also *United States v. Cook,* 432 F.2d 1093 (7th Cir.1970), and *In re Stewart,* 14 B.R. 959 (Bkrtcy.N.D.Ohio 1981), discussed at text accompanying note 21 infra.

**14.** *In re Martin,* 12 B.R. 319, 320 (Bkrtcy.S.D. Alaska 1981).

**15.** In fairness it must be said that this could have been one of those intentionally harsh judgments designed to "force the legislative hand." It literally applies the statute; but does it satisfy the legislative intent?

**16.** *In re Garber,* 4 B.R. 684, 6 B.C.D. 580, 581 (Bkrtcy.C.D.Cal.1980).

Thus escaped from, the judge went on to conclude in a six-paragraph opinion that the word "shall" was directory only, and declined to impose a penalty for the debtor's absence. Interestingly for purposes of our own analysis, no specific excuse had been given; the debtor simply had failed to appear.

To the same effect is *In re Killett*,[17] in which a Virginia bankruptcy court praised the application of the statute with evangelistic fervor [18] and then refused to apply it. Appearance at the hearing was characterized as mandatory except in "a few situations", which "may, in urgency, require individual remedies." The opinion forgave an airman on foreign duty and closed with a precognitive list of cases which would warrant excuse.

Equally cautious of the statute is another opinion from the same district but of different authorship, *In re Keefe*.[19] Like *Killett*, it draws on the court's inherent equity power, to excuse the absence of a debtor who had had a complete mental breakdown.

By far the most literate discussion of the question appears in *In re Mensch*, a 1980 opinion from the Southern District of New York. Elegant in its simplicity, the opinion nevertheless cites abundant and respectable authority, including the quotable Judge Learned Hand, for the avoidance of the literal application of language that "leads to absurdity or the abrogation of congressional intent." [20] *Mensch* excused a dis-

abled stroke victim from the discharge hearing.

*In re Stewart* [21] from the Northern District of Ohio bankruptcy court is also thorough in explaining the metamorphosis of "shall" to "may". The decision forgave the absence of a debtor with heart disease. While *Stewart* disclaimed the creation of a " 'carte blanche' excuse for debtors", it nevertheless issued a broad invitation with its observation that "where there is a good sufficient reason given, the attendance . . . is not obligatory but may be waived." [22] The case is the first even to suggest the notion of voluntary waiver.[23] It is that concept which we will employ in the cases at hand.

To summarize the bankruptcy cases, five of the six granted excuse upon either or both of two theories: (1) the inherent equity power of the court, and (2) a relaxed definition of the word "shall" as applied to the debtor's attendance.[24]

Equity theory respects the general integrity of the statute but creates an individual exception from it based on a finding of hardship. Definitional theory, on the other hand, goes to the very structure of the statute and requires no such finding. We prefer the latter approach, for reasons practical as well as legal.

The application of equity to avoid the literal word of the statute requires a court to make a threshold *substantive* determination, on a case-by-case basis, of whether a debtor must perform an *insubstantial* duty.

---

**17.** 2 B.R. 273 (Bkrtcy.E.D.Va.1980).

**18.** In the body of the opinion there appears this italicized aside directed to fellow judges: *"Brethren, we would err if we took these hearings lightly or considered them a nuisance. These rituals are the soul of it all."* In re Killett, 2 B.R. at 275.

**19.** 7 B.R. 270 (Bkrtcy.E.D.Va.1980).

**20.** *In re Mensch*, 7 B.R. 804, 805 (Bkrtcy.S.D.N.Y.1980).

**21.** 14 B.R. 959 (Bkrtcy.N.D.Ohio 1981).

**22.** Id., 14 B.R. at 961.

**23.** In context, it is likely that what was meant was the *court's* waiver of the *debtor's* duty to

appear, in which case the word was misused. As commonly understood, a "waiver" is a voluntary, self-directed act, having to do with the relinquishment of one's own rights, not the forgiveness of another's duties. *Garber,* supra note 16, was progressing toward the idea of waiver but stopped short of fully developing it.

**24.** The cases indicate that equity will not stand alone, that there first must be a permissive reading of the word "shall" *before* a debtor may be excused on equitable grounds. The findings of hardship seem to this writer to be judicial boilerplate. Only *In re Garber,* supra note 16, granted excuse on definitional theory only.

Conscientious review of individual applications for excuse would be a waste of judicial time if the exercise sought to be avoided (attendance) is without legal substance. Further, equity theory, because it is so highly individualized, gives future petitioners no predictability of whether their particular form of hardship would qualify for excuse. Hardship is, after all, a matter of degree, and distress is a jurisdictional requirement in this court.[25]

Predictability is an attribute of such importance that it has been equated with the very law itself.[26] The need for it can best be served by a rule of law that creates a reasonable classification of debtors to whom that rule applies. Insofar as predictability of result also yields judicial economy, a rule of law accomplishing it is further enhanced.

Definitional analysis, the stronger of the two available theories of statutory construction,[27] permits the formulation of such a rule, to render permissive the procedural aspects of the statute while preserving its underlying intent.

■ Applying that analysis, we are able to say that if in the case of an individual debtor there are no substantive issues to be formed, joined, heard or adjudicated, the 524(d) "hearing" is not a hearing at all, as to him, and his attendance at such an event

is permissive, not mandatory. He *may,* but not necessarily *shall,* attend. We so hold.

In the conclusion of this opinion we will describe the conditions upon which a debtor may be excused—conditions which, strictly and uniformly applied, will preserve the congressional intent of debtor protection. But before describing those conditions, we will indulge in a brief excursus in justification not of our result, but of the thinking process used in reaching it.

\* \* \* \* \* \*

It is far too late, in the long span of the common law, to question any further the place in American judicature of the so-called "judicial activist." Twentieth-century jurists have long since broken the bonds of *stare decisis* and brought broader resources to bear on the whole new libraries of legislation that regulate a complex nation, to keep the law apace with swift and unprecedented social change. More mechanical theories of jurisprudence inadequate to the task have been largely displaced by what could be called a theory of "free legal decision."[28] Modern judges are aggressively pragmatic and are likely to choose statistics over shibboleths[29] and to consider results as well as rules. An innovative judiciary has been with us for at

---

**25.** This court recently dismissed for lack of good faith the Chapter 7 petition of a wealthy debtor who had abused the bankruptcy process in order to evade creditors. *In re Khan,* 35 B.R. 718 (1984).

**26.** Holmes referred to "this body of dogma or systematized prediction which we call the law", and said in his classic essay *The Path of the Law* that: "The prophecies of what the courts will do in fact, and nothing more pretentious, is what I mean by the law." 10 Harv.L. Rev. 457 (1897).

Another writer reflects: "Every decision when made becomes the basis for future predictions. The judge knows this well. One of the imperatives that control him is the obligation to so decide that his decision may yield justice not merely in the case at hand but under the circumstances in which it will be used as a guide to the conduct of others than the parties before him." Rundell, *The Judge as Legislator,* 26 U.Kan.City L.Rev. 1, 11 (1958).

**27.** See note 24 supra.

**28.** The theory was named in a 1922 article describing the differences between the "mechanical theory" used by Anglo-American judges and the "free legal decision" employed by civil law courts in working around the inelastic provisions of codified law. The latter theory, embraced by Holmes, permitted a judge to "exercise discretion and to make choices as to the legal rules to be applied." Haines, *General Observations on the Effects of Personal, Political, and Economic Influences in the Decisions of Judges,* 17 Ill.L.Rev. 96 (1922).

**29.** *In 1897* Oliver Wendell Holmes wrote: "For the rational study of the law the black-letter man may be the man of the present, but the man of the future is the man of statistics and the master of economics." Holmes, *The Path of the Law,* supra note 26.

least thirty years and probably twice that long.[30]

This new sense of freedom, as we understand it, is neither a license for statute assassination nor an invitation to burn all the Blackstone. It means only that in "rare cases"[31] a judge may responsibly depart *from the historical integrity of statutes and rules of law.* It does, most certainly, allow traditional legal analytics to be reviewed against a widened intellectual horizon in a way that would have been thought quite impermissible earlier in the century. One quotation, more notable perhaps for its authorship than its words, best describes the assertive new judge's perception of his own limitations:

> Legitimate judicial law making knows *no express boundaries* as long as the court operates within the limitations of the Constitution and legal precepts *originally produced by judicial creativity.*

So concludes Ruggero Aldisert, teacher-philosopher and federal appellate judge, in a recent unpublished monograph on the judicial process.[32]

This sweeping view is tempered with the admonition that *acceptable* judge-made law "must be based on some justificatory principle of morality, justice, social policy or common sense."[33] Even the limitations are broad. With them Aldisert carries the baton passed by Cardozo.[34]

In the motions at hand there is no constitutional impediment to the rule we formulate.[35] The legal precepts from which we proceed are neither new nor novel. Recognized legal principles have been drawn from the cases.[36] The policy considerations we will address. As to common sense, we leave that to the reader to decide.

The general subject of judicial decision making has undergone extensive analysis at the hands of scholars. With a much narrower focus than Judge Aldisert's wide-ranging view, Kenneth Culp Davis writes:

> All judge-made law is made up of two major ingredients—applications of logic to the authoritative materials (precedents and statutes) and considerations of policy. The relative effect of each of the two major ingredients should be a variable and should not be allowed to become fixed. In property law, the weight given

---

**30.** The coming of age of judicial activism is generally associated with *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Pound, Cardozo and Brandeis had much earlier eschewed stare decisis in favor of a more sociological form of jurisprudence that came to be known as the school of "American realists."

The most striking *recent* example of reasoning around the clear language of a statute is Justice O'Conner's opinion in *Secretary of the Interior v. California,* —— U.S. ——, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984).

**31.** Davis, infra note 37, 61 Colum.L.Rev. 216 at note 34, estimates that in "maybe one in tens of thousands (of cases), we need judicial leeway, without accusing the judges of lack of fidelity to law, for violation of the structural integrity of prior case law." He cites *MacPherson v. Buick,* 217 N.Y. 382, 111 N.E. 1050 (1916), and other cases.

**32.** Aldisert, *Line Drawing: Acceptable and Unacceptable Judicial Law Making,* at p. 28 (copyright Ruggero J. Aldisert 1980) (emphasis supplied).

Not at all incidentally, Judge Aldisert is the author of *In re Bildisco,* 682 F.2d 72 (3d Cir. 1982), *cert. granted,* —— U.S. ——, 103 S.Ct. 784, 74 L.Ed.2d 992 (1983), momentarily to be decided by the Supreme Court. His opinion prompted one commentator to remark that "the court was reluctant to decide the case on so simple a ground as the plain and unambiguous language of the statute." Pulliam, *The Rejection of Collective Bargaining Agreements Under Section 365 of the Bankruptcy Code,* 58 A.Bank.L.J. 1, 28, 1984.

Among his other accomplishments, Aldisert was chairman of the Advisory Committee on Bankruptcy Rules to the Judicial Conference of the United States.

**33.** Aldisert, id, at p. 29.

**34.** "What really matters is this, that the judge is under a duty, within the limits of his power of innovation, to maintain a relation between law and morals, between the precepts of jurisprudence and those of reason and good conscience." Cardozo, *The Nature of the Judicial Process,* at 133 (Yale University Press, 1921).

**35.** The right to receive a discharge in bankruptcy "does not rise to the constitutional level", *United States v. Kras,* 409 U.S. 434, 448, 93 S.Ct. 631, 639, 34 L.Ed.2d 626 (1973).

**36.** See cases discussed in text accompanying notes 7–22, supra.

precedents and logic should be relatively large. In many matters of public law, the weight given considerations of policy should be relatively large. The determination of how much weight to give to each of the two major elements in any case is itself a question of policy to be determined by the court.[37]

The matters we decide today involve no property rights.[38] According to Davis' analysis, then, we would be justified in a radical departure from the "authoritative materials," although we have, once again, applied the reasoning of other bankruptcy courts.

Despite Davis' invitation, we would not presume to articulate any *public* policy, strictly speaking. We would, however, suggest that insofar as Section 524(d) has a great deal to do with *court* policy, we can and must take such considerations into account.

Earlier we described the costs of compulsory attendance at discharge hearings to debtors and attorneys. A point not emphasized in our discussion but implicit throughout is the burdensome effect of the attendance requirement on matters of court administration, such as docketing, noticing, and caseload management. It is still true that this court "is no more than the overseer and the administrator of the process,"[39] and those matters of internal policy, having direct bearing on the efficiency of the whole bankruptcy process, we overlook at our peril.

The manner in which we will excuse debtors from discharge hearings could be described as innovative, to the extent that it varies even in the slightest from the jot, tittle and comma of Section 524(d). But such experimentation is encouraged from high places. Just this month Chief Justice

Warren Burger, at the close of his Year-End Report on the Judiciary, said:

Experimentation with new methods in the judicial system is imperative given growing caseloads, delays, and increasing costs. Federal and state judges throughout the country are trying new approaches to discovery, settlement negotiations, trial and alternatives to trial that deserve commendation and support. The bar should work with judges who are attempting to make practical improvements in the justice system. Greater efficiency and cost-effectiveness serve both clients and the public.[40]

Concerning the inefficiency and inordinate costs of the discharge hearings we have already commented. By no reasonable cost-benefit analysis can they be justified. Nor, more importantly, can the resulting delays in other more substantive matters be reconciled with the need for swift justice.

The above readings find their way into this opinion not in the hope of earning any label, "judicial activist" or otherwise. We have intended only to show that our result is not as shallow or insouciant as it would appear standing alone, and that when read within the range of contemporary judicial thought, there is nothing new here, after all.

\* \* \* \* \* \*

 Addressing the motions at hand, these debtors will be excused from their discharge hearings upon furnishing satisfactory proof to the court that the following conditions have been met:

(1) That they have no motions of a substantive nature to bring before the court, including but not limited to motions for the avoidance of liens, redemption of property or approval of reaffirmation agreements;

(2) That they have been fully and completely advised by their counsel of their

---

**37.** Davis, *The Future of Judge-Made Law in England: A Problem of Practical Jurisprudence,* 61 Colum.L.Rev. 201, 215–16 (1961).

**38.** Property rights would be involved only if these debtors sought to reaffirm any debts, avoid liens, or redeem property.

**39.** Concurring opinion of Chief Justice Burger, *United States v. Kras,* supra note 35, 93 S.Ct. at 640.

**40.** Year-End Report on the Judiciary, at pp. 17–18 (1984).

rights and duties as outlined in 11 U.S.C. § 524(d) and have received an emphatic warning of the postbankruptcy consequences of the execution of any reaffirmation agreement;

(3) That their counsel has so advised them with reference to their individual case, in the full confidentiality of the attorney-client relationship, and specifically in the absence of any creditors or their representatives;

(4) That they fully and completely understand and accept the advice so given, and still do not wish for any reason to attend a discharge hearing, and

(5) That their counsel will officially report to the court that he has given the required advice and will stand accountable to the court for his failure to do so.

■ "Satisfactory proof" of all of the above conditions may take the form of a joint affidavit and waiver, a single document to be executed by the debtor and his attorney. It may be similar to the "Affidavit and Waiver of Discharge Hearing" which is attached to this Memorandum Opinion for illustrative purposes and made a part hereof. If the facts of a particular case warrant, the affidavit may be more individualized and specific.

■ Such an affidavit must be filed with the court at least ten (10) days prior to the debtor's scheduled discharge hearing.

■ If with reference to any pending motion the above described time limitation has expired during the time the present matters have been under submission, an extension of time will be granted in that case. In all other cases the ten-day advance filing requirement will be strictly enforced.

■ Upon receipt by the court of such an affidavit, fully executed, in proper form and timely filed, the debtor will then stand excused from the scheduled discharge hearing, without the necessity of any motion accompanying the affidavit or any further confirming order by the court.

■ If a debtor for any reason shall fail to timely file the affidavit, the debtor and his counsel will be required, subject to sanctions of court, to attend the discharge hearing as scheduled. Sanctions for failure to either file an affidavit or attend the discharge hearing may include dismissal of the bankruptcy petition, reduction of the attorney's fee, or both.

Upon those terms and conditions, the pending motions are hereby SUSTAINED. This is a final order.

We are authorized to say that Judge Brown of this Court concurs in the result.

### APPENDIX

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF KENTUCKY

| IN RE: | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| _____ Debtor ) | CASE NO. |

### AFFIDAVIT AND WAIVER OF DISCHARGE HEARING

I understand that I will receive a discharge in bankruptcy and that as a result I am not required by any law whatsoever to pay any of the debts listed in my petition. If there are any exceptions, my attorney has fully advised me of the creditors I will be required to repay, of the amounts and terms of repayment.

I further understand that if I have agreed in writing to repay any of the creditors listed in my petition, I must appear in Court and will have a grace period of 30 days from the date of the hearing to reconsider, and decide not to repay those particular debts. I know that all I need to do is inform the Court in writing that I have changed my mind.

I further understand that if I have agreed in writing to repay any of my creditors, and if the Court approves that contract, then if I later fail to make the payments as agreed, my property may be repossessed and I may be sued, and I would no longer have any protection under the bankruptcy laws.

I further understand that if I want to redeem any secured property, and if the

creditor does not agree to my redemption price, then I must appear in Court to redeem my property.

I have read and do understand this affidavit and by signing below I voluntarily waive my right to attend a discharge hearing in open court.

> NOTICE TO DEBTOR: IF YOU WISH FOR ANY REASON TO ATTEND A DISCHARGE HEARING IN OPEN COURT, DO NOT SIGN.

_____ _____
Debtor Date

The undersigned, counsel for the debtor, does hereby certify that I have fully explained the above affidavit to my client; that the debtor understands its content and meaning; has signed it in my presence with no creditors or their counsel present; and that the debtor does voluntarily waive the right to a discharge hearing.

_____ _____
Counsel for Debtor Date